**WYATT C. HEDRICK, Inc., v. RATCLIFF.**
No. 12562.

Court of Civil Appeals of Texas.
Fort Worth.
Nov. 7, 1931.

Rehearing Denied May 6, 1933.

Charles Kassel, of Fort Worth, for appellant.

Ratcliff & Christian and Hampden Spiller, all of Fort Worth, for appellee.

BUCK, Justice.

E. R. Ratcliff, of Shreveport, parish of Caddo, state of Louisiana, filed suit against Wyatt C. Hedrick, Inc., alleging that in February or March, 1929, the plaintiff and defendant entered into negotiations with the view of constructing a building in the city of Shreveport, the purpose of said negotiations being the employment of said defendant as architect for the preparation of plans and specifications of said building and the supervision of its construction; that said negotiations eventually resulted in making of a contract, which contract is evidenced by certain letters and telegrams passing between plaintiff and defendant, and by the terms of which contract the defendant agreed and bound himself to prepare preliminary sketches or plans and estimates covering the proposed building, which was to be a three-story building according to plans prepared and submitted by Montgomery Ward & Co., and to submit the same to plaintiff for his approval without obligation on the part of plaintiff unless and until the said building was actually constructed and leased to Montgomery Ward & Co., a corporation domiciled in the city of Chicago; and in the event said deal or transaction then pending with Montgomery Ward & Co. was finally consummated and said building actually constructed, said defendant was to be retained as architect to prepare plans, specifications, and estimates and to supervise the construction of said building, for which service the said plaintiff herein agreed and bound himself to pay to the said defendant the sum of $1,400 in the event the said building was not constructed after the completion of final plans, specifications, and estimates; but in the event the said building was finally constructed and the transactions of Montgomery Ward & Co. were finally consummated, the plaintiff bound himself to pay to the said defendant the total sum of 6 per cent. of the cost of said building, the said $1,400 to be credited on said amount. In this connection plaintiff pleaded that all of the negotiations referred to by and between plaintiff and defendant were conducted on the part of said defendant by and through Wyatt C. Hedrick, president of said corporation, he being thereunto fully authorized and empowered to act for and on behalf of said defendant.

Plaintiff further pleaded that after negotiations with Montgomery Ward & Co. had reached a stage where both the plaintiff and defendant believed that the said transaction would be consummated and that the lease upon which the agents of Montgomery Ward & Co. and the plaintiff had agreed, would be executed by Montgomery Ward & Co. through its duly authorized officers, and acting on the belief that the said building would be actually constructed upon the terms and conditions set forth in said lease contract with Montgomery Ward & Co., and that said defendant would supervise the construction of said building and thereby earn the 6 per cent. of the cost of said building as hereinabove set out, the plaintiff at the urgent request of defendant advanced, in addition to the said $1,400 theretofore agreed upon, the sum of $2,600 as a payment on the total amount agreed upon to be paid to defendant in the event the said building was constructed and defendant supervised said construction. Plaintiff further pleaded that the negotiations with the agent of Montgomery Ward & Co. relative to the construction and leasing of said building were purely tentative and subject to the approval of the officers of said corporation, who resided in Chicago, and that it was understood by all parties, including defendant, that Montgomery Ward & Co. was not bound to lease said building until said approval had been made by said officers in Chicago and a written lease executed by them to plaintiff. Plaintiff pleaded that said lease was never executed, that is, upon the specifications submitted by defendant. Montgomery Ward & Co. declined to execute said lease and peremptorily terminated all negotiations concerning the leasing of said proposed building from plaintiff. That after the failure of Montgomery Ward & Co. to lease said building upon the specifications made by defendant, plaintiff demanded of the defendant the return of said excess of $2,600, but the defendant failed and refused and still fails and refuses to pay same, or any part thereof.

Plaintiff further pleaded that said failure of Montgomery Ward & Co. to lease said building was for reasons unknown to plaintiff, and that defendant was obligated and bound to repay to plaintiff the $2,600 theretofore paid him, in addition to the $1,400 which plaintiff owed.

Defendant answered by a general demurrer and a general denial, and by way of cross-action defendant pleaded that on or about March 4, 1929, he and plaintiff entered into negotiations by which defendant would prepare preliminary plans and furnish estimates of costs without obligation on the part of plaintiff and defendant if the negotiations with Montgomery Ward & Co. did not result in a contract between that company and plaintiff for the erection of the building to be used by that company, but with the obligation on the part of plaintiff if said negotiations did result in a contract for the erection of the building for Montgomery Ward &

Co. by plaintiff, to pay to this defendant 6 per cent. of the cost of such building covering the execution of plans and supervision of the work; and plaintiff and defendant entered into a verbal contract, partially evidenced by letters between them, whereby defendant would prepare complete plans and take bids from contractors for the erection of the building by plaintiff, the plans not to cost in excess of $2.800, of which plaintiff, in that event, would pay one-half, or a maximum of $1,400 to defendant, and, if the actual cost of making the plans, writing the specifications, and taking the bids should be less than $2,800, plaintiff in such case, upon the failure of Montgomery Ward & Co. to lease the building specified, should pay only one-half of said amount, but in the event the work did go ahead and the building was erected by plaintiff for Montgomery Ward & Co., the defendant would do such work for plaintiff on the basis of actual cost plus a fee of 6 per cent., and defendant would keep a superintendent on the ground at all times and the work should be done under the supervision of such superintendent representing plaintiff, but being under the direction of defendant; and defendant pleaded that in pursuance of such performance it prepared all plans complete with specifications in accordance with the understanding between plaintiff and defendant, and the customs and usages prevailing in such cases after such plans had been approved by Montgomery Ward & Co., it awarded the general contract to James T. Taylor, being the lowest bidder, on the basis of $85,100, and other contracts were awarded to other contractors upon competitive bids, all with the knowledge and consent and and approval of plaintiff, making an aggregate cost of $98,948, the contract having been awarded to Beach Plumbing & Heating Company in the sum of $4,595, and to the Dallas Electric Company in the sum of $3,400, and to Otis Elevator Company in the sum of $5,-853. Defendant further alleged that the lease for said building by Montgomery Ward & Co. had been approved by the representative of said company and had been signed by plaintiff and forwarded to Chicago for the signature of Montgomery Ward & Co., and defendant, acting in good faith of all such facts made preparations for the work in question and incurred large expense in connection therewith; that on or about May 17, 1929, plaintiff notified defendant that Montgomery Ward & Co. had repudiated the agreement of their representative to lease such building and had refused to affix its signature to such lease, and that the negotiations with that company for the construction of the building by plaintiff on its behalf were definitely and finally at an end.

Plaintiff further pleaded that when the contract between plaintiff and defendant was made and defendant was instructed to prepare plans on the basis thereof, plaintiff paid to defendant as part payment of the indebtedness to accrue in favor of defendant from plaintiff, the sum of $4,000, and that when defendant was informed by plaintiff that Montgomery Ward & Co. had refused to accept the building and to sign the lease and had repudiated the agreement made by its representative, and that no building would be built by plaintiff for that company, this defendant, relying on such statements and believing that such negotiations were definitely at an end and would not be revived, and that no building of any character would be built by plaintiff for Montgomery Ward & Co., agreed to refund $2,600 of the $4,000 theretofore paid. Defendant further alleged that both he and plaintiff felt that in reality the refund in question should be made by Montgomery Ward & Co. to plaintiff, notwithstanding that this defendant had agreed to make such refund to plaintiff if the same could not be collected from Montgomery Ward & Co.

Defendant further pleaded that under the understanding and contract between plaintiff and defendant, the plaintiff, in the event any building was erected by him for Montgomery Ward & Co., was to avail himself of the services of this defendant in the construction thereof, on the basis heretofore set forth, and defendant was entitled to supervise the construction of the building actually erected for Montgomery Ward & Co., modifying this defendant's plans and specifications as might be necessary to that end, and receiving bids for that purpose, but that in reality plaintiff repudiated by his conduct the obligation he sustained to this defendant and discharged the defendant without just cause.

Defendant further pleaded that it knew nothing of the actual transactions as finally consummated between Montgomery Ward & Co. and plaintiff, and that plaintiff had withheld from him the facts in regard thereto, and defendant does not know whether said transaction was so shaped by plaintiff as seemingly to show that he was saving all architects' fees, but in reality the service of other architects were really being paid for and the obligation to pay therefor was merely hidden away in the terms of the trade with Montgomery Ward & Co. Wherefore, defendant prayed that plaintiff take nothing as against him and defendant recover of plaintiff the sum of $1,936.88, together with interest thereon from date of original contract as aforesaid.

Plaintiff filed a supplemental petition and answer to defendant's cross-action, in which he stated that this suit was a suit upon a contract, all the terms of which were full, definite, and complete, and, if in truth any such custom exists as set forth by defendant, the same would be wholly immaterial and could not bind plaintiff.

The case came on for trial on October 17, 1930, and the trial court instructed the jury

to find for plaintiff in the sum of $2,814.50, and costs of suit, and defendant take nothing. Upon the verdict of the jury thus found, the court rendered judgment for plaintiff as against defendant for $2,814.50 and costs of suit. From this judgment, defendant has appealed.

## Opinion.

The testimony in the case consisted of that of E. R. Ratcliff, plaintiff, and C. H. Page, of Page Bros., architects at Austin, and the testimony of Wyatt C. Hedrick, the president of defendant. While the statement of facts covers some 180 pages, there is practically no variance between the evidence introduced by plaintiff and that introduced by defendant. Plaintiff testified that he had a conference with Wyatt C. Hedrick at the Washington Hotel, at Shreveport, and that Hedrick agreed to make the plans and specifications and get bids for the construction of the building, and that his charge certainly would not exceed $1,400; that if the building was not erected, plaintiff would not have to pay more than $1,400; that he did not ask him to make any complete plans and specifications without making an offer to pay for them; that his negotiations with Montgomery Ward & Co. reached the point of drawing up a lease based upon the cost of the building, as indicated by the contractors' bids; that he signed such lease contract and sent it to Chicago for the approval and signature of the officers of Montgomery Ward & Co.; that Mr. Hedrick prepared some complete plans and specifications for the building and that he believed that he sent out requests for bids on the building, based on those plans and specifications, and did get bids on the building; that the lowest bids he had on the building for which Mr. Hedrick prepared to act as architect was approximately $98,000; that the cost of the building and 6 per cent. architect's fee would have amounted to over $105,000; that while he thought, and the defendant thought, that Mr. Kendall Smith, representing Montgomery Ward & Co., had authority to act for that company, that Mr. Smith told both of them at all times that he would not have authority to bind Montgomery Ward & Co. and that the lease would have to be sent to Montgomery Ward & Co. for its approval.

Upon the return of Wyatt C. Hedrick from Shreveport to Fort Worth, he wrote Ratcliff the following letter:

"Upon my return to the office today, I am writing you confirming conversation Friday night in the Washington Hotel.

"We will proceed immediately with getting out the work drawings and specifications as quickly as we can get data from Chicago, relative to which I had Mr. Patterson write you, also to enclose you blue print on the ground lay out as far as we can get it until we get the data from Chicago, which in conversation with their local office today, we believe it will be in sooner than Mr. Patterson wrote you, or in the next two or three days. The conversation we had was as follows:

"We will make the plans complete and take bids, and if the job did not go ahead we would guarantee the plans not to cost in excess of $2,800.00, you to pay one-half, or a maximum of $1,400.00. If the actual cost of making the plans, writing the specifications, and taking the bids is less than $2,800.00, we to keep an accurate charge on same, then your share will be 50 per cent, but in no case to exceed $1,400.00.

"We will do this work for you on actual cost, plus a fee of 6 per cent thereof, and we will keep a superintendent on the ground at all times after the work starts, and that superintendent to represent you, and under our direct supervision, of course.

"I believe that this covers in detail the matters that we discussed Friday evening, and if there are any corrections that you care to make, please advise.

"We have before us letter to you from Mr. John Y. Snyder, together with schedule of Minimum Basic Charges of the local architects of the American Institute, together with your pen note of the 17th, also the writer has talked to Mr. Baker relative to your conversation Saturday. We will leave the matter of this part of the subject until I can see you in person again. As explained to you, we have never done any work in Louisiana for less than 6 per cent, and would like to have your permission to check up the charges of the other architects throughout the state account of our being an out-of-state firm. We do not wish to penalize you, and with your permission we will hold this in abeyance until I can see you.

"With kindest personal regards, and glad to see you again, and hoping your son-in-law is much improved, I am

"Yours very truly."

This letter evidently contains the understanding of defendant as to the terms upon which he was to have supervision of the erection of the building and the payments to be made thereon and the time for such payments to be made.

On May 15, 1929, plaintiff wrote the defendant that the Chicago office had advised him as follows: "Chicago office advises us that your proposition has been rejected."

He further stated that such information was a surprise to him as he had every reason to believe, and still believed, that Mr. Smith was acting with full authority and instructions from the Chicago office. However, Montgomery Ward & Co. declined to proceed, and under such circumstances plaintiff was entitled to a refund from defendant of $2,600 out of the $4,000 paid defendant on May 4, 1929, and that he would appreciate a check from defendant for this amount.

On June 1, 1929, plaintiff wrote defendant in which he stated that the whole transaction of the erection of the building on the plans submitted by defendant had been definitely and permanently closed, and therefore he would appreciate defendant's check for $2,-600. On June 3, 1929, defendant wrote plaintiff a letter in which he stated that Mr. Neidelman, a representative of Montgomery Ward & Co., was in his office, and that without Neidelman's knowing that he had promised to refund any part of the $4,000, Neidelman told defendant that Montgomery Ward & Co. was obligated to pay him the $4,000, and that defendant told Neidelman the whole transaction between plaintiff and defendant, but that Neidelman told him that he still thought Montgomery Ward & Co. owed plaintiff $4,000 for the fee that plaintiff had paid defendant; that Neidelman had suggested to defendant that plaintiff write a letter to Montgomery Ward & Co. giving him and Mr. Smith as evidence and requesting that Montgomery Ward & Co. pay the $4,000 for the architect's fee.

On June 5, 1929, plaintiff wrote W. E. Allen, real estate and research manager of Montgomery Ward & Co., in which he stated that he inclosed his bill for $4,000, being the amount of the architect's fee which he had to pay Wyatt C. Hedrick; that under the circumstances he felt there was no doubt whatever that Montgomery Ward & Co. should reimburse him for this amount; that the transaction was carried through up to the point of signing the lease, which he did by request of Kendall Smith, and on his assurance that Montgomery Ward & Co. would sign the lease and wire plaintiff to the effect not later than Thursday following the Saturday, May 4th, on which date he signed the lease, and Mr. Smith accepted it for Montgomery Ward & Co.; that the closing of the transaction up to this point necessitated payment of architect's fee of $4,000, which he did on May 4th. On the same day plaintiff wrote to defendant that he had sent the bill to Montgomery Ward & Co. for the $4,000 on account of the architect's fee, and wrote them demanding payment; that he did not like this plan of handling the matter very well, though it might be worth trying; and that if Montgomery Ward & Co. would pay the amount it would be satisfactory to both plaintiff and defendant; that if they did not pay, he, plaintiff, did not see how he could afford to sue them for the $4,000, having an agreement with plaintiff for a fee of only $1,400 under existing circumstances; that if they refused to pay the $4,000, he would expect from defendant the $2,600 theretofore paid him in the check for $4,000.

On June 6, 1929, defendant wrote plaintiff a letter, a part of which reads as follows: "As per my conversation with you on the morning of the 4th, it is my pleasure to assure you that this is your money, and I will return it to you, but believe if we give it back to you we will not have a leg to stand on, and wish to handle this further with Mr. Smith and Mr. Neidelman to get this money, and your promise to help."

On August 2, 1929, Montgomery Ward & Co. wrote Mr. Ratcliff, in which letter it was stated that Montgomery Ward & Co., did not believe they were under any obligation to reimburse the plaintiff for any expenditures which he may have incurred in promoting the proposed lease of the property in Shreveport, and advised him that Montgomery Ward & Co. could not reimburse him for the amount of the architect's fee submitted to them; that they had been to considerable expense in trying to consummate the deal, but that such promotion expenses should be borne by each party on its own account; that plaintiff knew, as shown by a letter of March 2, 1929, that the lease contract had to be approved by Montgomery Ward & Co. before it became effective.

Appellant urges that whether the $4,000 paid was a voluntary payment made without reservation and in the light of all the facts and without any fraud on the part of appellant, it cannot recover even though paid under the mistake under which plaintiff and defendant were laboring at the time the $4,000 was paid, including the $2,600 sought to be recovered, had reference to a future event, that is, the approval by Montgomery Ward & Co. of the lease contract sent to it. He cites 48 Corpus Juris, page 734 et seq., where it is said: "Except where otherwise provided by statute it is a well settled general rule that a person cannot, either by way of set-off, or counter-claim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed."

And on page 761 of the same volume, it is said: "The rule permitting recovery of payment made under mistake of fact being founded upon consideration of equity and good conscience, there can be no recovery of a payment from which the payor has received a substantial benefit, or which the payee has received in good faith and may in good conscience retain, or which was due to him in honor and conscience, although it was made under a mistake of fact."

Appellant also claims that by the terms in the agreement "if the job did not go ahead" means that "if no building work for Montgomery Ward & Company goes ahead," or "if no building is erected for Montgomery Ward & Company," and that a building was erected for Montgomery Ward & Co. He further urges that even though neither of these contentions is sound, the case should have been submitted to the jury in the light of the testimony.

We do not think the quotation from Corpus Juris, vol. 48, p. 761, states the facts of this case, that there can be no recovery of a payment for which the payor has received a substantial benefit. Appellee received no benefit from the work done by appellant and under the agreement appellee was to pay upon the submission of the plans and specifications only $1,400. This is a total loss to appellee and should, in our judgment, be the extent of his loss. The facts were largely undisputed, and there was nothing to go to the jury as to what the liability of defendant to plaintiff was. We think this case comes under the rule laid down in Gauntt v. Chehalis County, 72 Wash. 106, 129 P. 888, decided by the Supreme Court of Washington. In that case Chehalis county and Gauntt, an architect, entered into a contract by the terms of which the architect was to prepare plans and specifications for a courthouse building and deliver them to the defendant, which was done. The agreement was that the county should be liable for this work only in the sum of $1,000. Some two and one-half years later the county concluded to build a courthouse and advertised for architects' bids and Gauntt, along with other architects, submitted plans and specifications for the work. The work was given to another architect and Gauntt sued the county. A provision of the contract of employment between Gauntt and the county contained these words: "It is understood and agreed by both parties to this contract that, should contract for building not be let, then the party of second part is to receive the sum of one thousand dollars ($1,000.00) only for plans and specifications, same to be applied as part payment in the event of the building going ahead at some future time."

The court held that the words "the building" in a contract of county commissioners with an architect to draw plans for a courthouse, providing that, if contract for building be not let, the architect shall receive $1,000 only for plans and specifications, same to be applied as part payment in the event of the building going ahead at some future time, means the building to be erected according to such architect's plans, so that he is entitled to no compensation further than the $1,000, the courthouse having been constructed according to plans subsequently made by another.

We think that the facts in the Washington case and this case are essentially similar as to the legal questions involved. We are further of the opinion that there was no question of fact to be passed on by the jury and that a peremptory instruction was proper.

In Turner v. Montgomery, 293 S. W. 815, by the Commission of Appeals, it is said:

" 'In the construction of instruments, the entire instrument, together with the surrounding circumstances, should be looked to, and, if it is ambiguous, parol evidence may be offered to enable the court to determine the real intention of the parties.' * * *

"If there is no ambiguity, the construction of the written instrument is for the court, and moreover, even in those cases of ambiguous instruments, if the parol evidence is undisputed as to the circumstances, the construction is yet a question of law for the court."

See Penn v. Hare (Tex. Civ. App.) 223 S. W. 527, application for writ of error dismissed by the Supreme Court for want of jurisdiction. In this case it is stated, quoting from the headnotes: "Where there is a doubt as to the meaning of a contract in writing arising from the language used, and not from extrinsic matters, the question as to what the parties meant is for the court, and not the jury."

See Texas Construction Co. v. Dearing (Tex. Civ. App.) 296 S. W. 1112, affirmed in (Tex. Com. App.) 1 S.W.(2d) 265.

While appellant claims that the appellee did not in good faith make a claim to Montgomery Ward & Co. for the payment of the $4,000, including the $2,600 sued for, paid appellant, yet we can see nothing to justify this allegation of bad faith on the part of appellee. Nor do we see any ground for the contention that the evidence presents questions of fact to be decided by the jury rather than by the court. It seems to us that the only questions to be decided were questions of law, based upon the right of appellee and appellant. Therefore, the judgment below is affirmed.